## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **HEART 4 HEART, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-cv-03156** |
| | ) | |
| **KATHLEEN SEBELIUS,** | ) | |
| **in her capacity** | ) | |
| **as Secretary of the** | ) | |
| **U.S. Department of** | ) | |
| **Health and Human Services,** | ) | |
| | ) | |
| **Defendant.** | ) | **ALJ No. 1-756545121** |
| | ) | **MAC No. M-11-2558** |

### OPINION

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

The issue in this case is whether substantial evidence exists to affirm a Medicare Appeals Council's decision that Plaintiff Heart 4 Heart, Inc., a company that provides medical equipment to people with physical challenges, failed to show why a motorized wheelchair was medically necessary for Mary Kay Gould, a paraplegic beneficiary. Plaintiff Heart 4 Heart's Complaint in this case seeks review under 42 U.S.C. § 1395ff and 42 U.S.C.A. § 405(g) of the Medicare Appeals Council (MAC) decision denying Plaintiff's

Medicare reimbursement claim for the motorized wheelchair Plaintiff supplied to the beneficiary. Plaintiff has filed a Motion for Summary Judgment (d/e 10) and Defendant Secretary of Health and Human Services has filed a Motion to Affirm the Medicare Appeals Council's Decision (d/e 12). Because the Medicare Appeals Council's decision denying the reimbursement claim was not supported by substantial evidence, the Court GRANTS Plaintiff's Motion, which is styled as a Motion for Summary Judgment (d/e 10), and DENIES Defendant's Motion to Affirm (d/e 12). The MAC's decision is REVERSED.

## I. FACTUAL BACKGROUND

On October 30, 2009, 68-year-old Mary Kay Gould ("the Beneficiary") received a motorized wheelchair from Plaintiff Heart 4 Heart, Inc., a company that provides medical equipment to beneficiaries with physical challenges. The Beneficiary has had paraplegia since a 1963 car accident. <u>See</u> Administrative Record ("AR") 0289. According to Plaintiff, the Beneficiary has been using a motorized wheelchair since 1990.[1] <u>See</u> Response to Defendant's

---

[1] At the hearing before the Administrative Law Judge, Plaintiff's employee-representative David White testified that the motorized wheelchair the Beneficiary received in 2004 was approved by

Motion to Affirm, d/e 13 at 1.  When the Beneficiary visited Occupational Therapist David Burget in June of 2009, she learned that the motorized wheelchair she had been using since 2004 was "beyond repair and would require extensive repair and modifications to meet her mobility and seating needs."  Burget Eval, AR 0086.  In short, "Replacement [wa]s required."  Id.

**1. The Occupational Therapist Evaluating the Beneficiary Stated that a New Motorized Wheelchair was "Medically Necessary."**

In addition to evaluating the wheelchair, Mr. Burget also evaluated the Beneficiary's strength and physical abilities.  Mr. Burget found that the Beneficiary's "active range of motion" (AROM) for her arms was "within functional limits."  Burget Eval, AR 0086. After performing a manual muscle test, Mr. Burget found that the Beneficiary's shoulder strength was 4-/5 and her elbow strength was 4/5.  Id. at 0087.  Her grip strength was 55 pounds in her right hand and 45 pounds in her left.  Id.  Mr. Burget found that the Beneficiary's endurance was "fair" and that while her "supported"

---

Medicare.  AR 0287.  Defendant disputes this claim, arguing that it is unsupported by documentation in the record and immaterial.  See Defendant's Motion to Affirm, d/e 12 at 8. Mr. White also stated at the hearing that he thought the Beneficiary had used two motorized wheelchairs prior to 2004 and that Medicare had paid for both of them: "I think two other power chairs previous to that [2004] one, both paid for by Medicare."  AR 0289.

balance was "good," her "unsupported" balance was "poor, unsafe." Id. He also wrote in his evaluation that the Beneficiary received "assistance with all of her self care and house hold chores." Id. at 0086. Mr. Burget wrote in his five-page evaluation that healthcare assistants come to the Beneficiary's single-story home five days a week for four hours at a time. Id. at 0086. The Beneficiary was "dependent" on assistance to transfer her from her wheelchair to other surfaces. Id. at 0087. Mr. Burget also made a number of notations about the type of motorized wheelchair and the accessories he thought were "medically necessary." Id. Mr. Burget wrote that "many equipment options were considered" during his evaluation with the Beneficiary and that a powered wheelchair and 17 accessories were the "most reasonable and cost effective in meeting her needs." Id.

Mr. Burget concluded that the Beneficiary "requires a power wheelchair frame because she is unable to ambulate and is also unable to propel a manual wheelchair as a result of her current diagnosis and medical history." Id. at 0088. The Beneficiary's medical history documented in the evaluation includes bladder cancer, deep vein thrombosis, cholecystectomy (gallbladder

removal), colostomy, decubitus ulcers, sleep apnea, Type II diabetes, GERD, depression, and anxiety.  Id.  at 0086.  Mr. Burget also noted that the power wheelchair is "accessible" to the Beneficiary's home and "would allow her to access all areas of her home so that her caregivers may attend to her and her mobility related activities of daily living."  Id.  at 0088.  A "Power Articulating Elevating Center Mount Foot Platform" for the motorized wheelchair was needed because "[the Beneficiary] lacks the upper extremity strength and trunk control to lean forward and raise or lower her center mount foot platform manually."  Id.  at 0089.  He also noted that a "Power Seat Elevator" was a necessary accessory to "transfer 'downhill' (gravity assisted) secondary to upper extremity weakness and limited trunk control, and also because her caregivers cannot lift her onto another surface."  Id.  at 0090.  On July 2, 2009, Mr. Burget signed the evaluation, as well as a form from Plaintiff "attest[ing]" that he did not have a "financial relationship" with Plaintiff.  Id.  at 0092.  Dr. David Gelber, the Beneficiary's physician, affirmed and signed Mr. Burget's evaluation after he evaluated the Beneficiary five days later on July 7, 2009.  Id.  at 0090.

## 2. The Evaluation Conducted by Beneficiary's Physician Notes that the Beneficiary's Upper Extremity Strength is "Normal."

Dr. Gelber also completed a one-page evaluation dated July 7, 2009 after the Beneficiary came to see him for a "followup," face-to-face meeting "to get approved for her power wheelchair."  Gelber Eval, AR 0093.  He also noted that she has "bladder cancer and her chemotherapy is now completed.  She is doing well.  She has an ileal conduit in place and a colostomy in place."  Id.  He listed the following "active problems" on the evaluation:  arthritis, carcinoma of the bladder, neurotic depression, fatigue, irritable bowel syndrome, obesity, osteoporosis, paraplegia, sleep apnea, history of thrombophlebitis of the legs, Type II Diabetes, and Unable to Restrain Bowel Movement.  Id.  Dr. Gelber also noted that "Her upper extremity strength was normal, lower extremity strength was 0/5."  Id.  Dr. Gelber stated that "Overall, Beneficiary's course is stable.  She is in need of a new power wheelchair and I will sign off on the recommendation from her therapist in Decatur [David Burget]."  Id.  The "Plan" that ended the evaluation included two steps:  "1. Beneficiary to get a new power wheelchair.  2. Follow up in six months."  Id.

### 3. The Beneficiary Received the Motorized Wheelchair, and the Plaintiff Received Reimbursement and Then a Letter from Medicare Demanding the Money Back.

A few months after Plaintiff's employee Robert White determined that the Beneficiary's home could accommodate a power wheelchair, the Beneficiary received the power wheelchair Mr. Burget had recommended in his evaluation.  See AR 0263, 0239-40. The total cost of the motorized wheelchair and the accessories was $25,487.00.  Id. at 0170 (invoice dated October 30, 2009); see also AR 0140 (listing total of $26, 297.00 for motorized wheelchair and accessories on invoice dated October 27, 2009).  Plaintiff submitted a claim for the wheelchair to Medicare under Part B of the Medicare Act, the supplemental program that covers medical and other health care services and medical supplies such as a power wheelchair.  See 42 U.S.C. §§ 1395j-x.  Medicare Part B covers motorized wheelchairs, which are considered "durable medical equipment," only when those items are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395(y)(a)(1)(A); 42 C.F.R. § 411.15(k)(1).  On January 15, 2010, Medicare paid Plaintiff's claim.  See AR 0146.

In September of 2010, Plaintiff received a letter stating that Medicare had overpaid Plaintiff $11,681.38 because the documentation Plaintiff provided with the claim did not support the medical necessity for the power wheelchair. Id. at 0264-72; see also id. at 0172 (letter regarding redetermination stating that Plaintiff was required to refund $11, 681.38). The letter also stated that because Plaintiff should have known that Plaintiff was not entitled to the payment, Plaintiff had to repay the overpayment amount. Id. at 0264. Plaintiff appealed this decision, initiating the administrative appeals process that would eventually come to this Court three-and-a-half years after the Beneficiary received her new motorized wheelchair.

The first level of appeal was a request for "redetermination" to the National Government Services, Inc. (NGS), an entity that contracts with Medicare to resolve Part B claims. See 42 U.S.C. § 1395ff(a)(3). Plaintiff requested a redetermination on October 25, 2010, and submitted two documents in support of Plaintiff's position. One document labeled "Justification Addendum" and signed by Dr. Gelber and Mr. Burget consisted of two paragraphs:

**Manual wheelchair mobility:** [The Beneficiary] is unable to propel any type of manual wheelchair due her limited strength in her upper body and lack of endurance to propel self functional household distances. She also lacks the ability to shift her weight to provide pressure relief, which could result in skin breakdown. [The Beneficiary] also has limited trunk control and safety would be an issue with attempting functional activities from manual wheelchair.

**Power Scooter Mobility:** [The Beneficiary] is unable to use a power scooter as she lacks the necessary trunk control to safely balance on the scooter seat. Transfer to/from the scooter would also put her at risk of falling. She lacks the ability to shift her weight and would not be able to be set up with the proper seating to prevent skin breakdown.

AR 0091.

The other document was a letter from Dr. Gelber that stated:

[The Beneficiary] is currently under my care and treatment for paraplegia. I would like to clarify that [the Beneficiary's] upper body strength is normal for her but is not adequate to propel a manual wheelchair. I am writing in request that her electric wheelchair be covered.

AR 0094.

NGS, the Medicare contractor, issued a brief decision that was "unfavorable" to Plaintiff. Id. at 0171. NGS found that the medical documentation "did not adequately support" that the Beneficiary's

upper body strength was insufficient to propel a manual wheelchair
or use a Power Operated Vehicle (POV) or scooter to complete
Mobility Related Activities of Daily Living (MRADLs).  Id. at 0172.
NGS specifically mentioned Dr. Gelber's notation that the
Beneficiary's upper extremity strength was "normal" and Mr.
Burget's findings about the Beneficiary's grip strength and range of
motion in her upper extremities.  Id.

After this unfavorable decision, Plaintiff obtained a second
"Justification Addendum" from Dr. Gelber and Mr. Burget, dated
December 10, 2012:

> **Manual wheelchair mobility:** [The Beneficiary]
> demonstrate[s] functional AROM and grip strength
> to both upper extremities.  She does not however
> have the endurance or physical ability to meet ADLS
> [activities of daily living] or self care needs without
> the assistance from a caregiver.  [The Beneficiary]
> demonstrates the ability to grip the wheels on a
> manual [wheelchair] but lacks the enduring
> strength to propel self household distances in order
> to meet or participate in functional skills.  [The
> Beneficiary] currently has limited trunk control and
> would not have the additional energy required to
> propel self in a manual [wheelchair], her safety
> and/or sitting balance would be even more
> jeopardized.  [The Beneficiary] does not have the
> lasting strength/endurance in her upper body to
> propel a manual [wheelchair] in order to meet ADL
> needs or maneuver household distances, therefore

she cannot meet her ADLS without the replacement
power chair.

Id. at 160.

Plaintiff submitted this Justification Addendum to a Qualified

Independent Contractor (QIC) for the next step in the administrative

appeals process.  See id. at 0147.  On March 18, 2011, the QIC

issued another "unfavorable" decision.  Id. at 0146.  The QIC panel,

which consisted of a physician and a nurse, found that Plaintiff

failed to submit documentation to show that the powered

wheelchair was "necessary."  Id. at 0147.  The QIC also found that

the "physician office notes do not include sufficient documentation

to meet the Medicare criteria for a face to face evaluation" listed in

the Local Coverage Determination and the related Policy Article.  Id.

Finally, the QIC stated that because the Plaintiff should have

known that the wheelchair did not meet criteria for coverage,

Plaintiff, rather than the Beneficiary, was responsible for the

$11, 681.38 reimbursement.  AR 0148.

Plaintiff appealed this decision to the Administrative Law

Judge ("ALJ"), who held a hearing on June 14, 2011.  At the

hearing, Plaintiff's employee Robert White and Mr. Burget, the

Beneficiary's occupational therapist, testified by telephone.  Id. at 0277-78.  At the hearing, Mr. White, who identified himself as an assistant technology practitioner and a certified rehab technology supplier, stated that he helped the Beneficiary obtain her previous motorized wheelchair in 2004, and thought that Medicare covered that wheelchair, as well as her previous two motorized wheelchairs.  Id. at 0281, 0287-89.  Mr. Burget testified that the Beneficiary did not have the "enduring strength to be able to do functional activities," and referenced the addendum he completed in December of 2010.  Id. at 0292-93.  The ALJ asked why the addendum was "so late" after the evaluation in June of 2009 and noted that it "sounds like you're just trying to correct the paperwork so you can get paid."  Id. at 0293.

When the ALJ asked why the Beneficiary could not propel a manual wheelchair when it "sounds like she has sufficient strength in her upper body to do it," one of the witnesses[2] gave the following answer:

---

[2] The transcript credits this statement to Mr. White, Plaintiff's representative.  However, this speaker describes conducting the actual strength and muscle tests on the Beneficiary and these tests were conducted by the occupational therapist, Mr. Burget, not Mr. White.  Both witnesses testified by phone at the hearing before the ALJ, who was in Irving, California.  See

Your Honor, when I look at upper body strength, especially at the shoulder, I deemed it as 4 minus (ph.) out of 5, which means she's not able to sustain that strength. In other words, she gives away when I test her upper body and that would carry over into functional activities. In other words, when she goes to—when she would go to propel a wheelchair, she might be able to propel it for . . . a minimal amount of distance, but she could not sustain that to be able to do anything functional for herself . . . .

Id. at 0296.

The ALJ affirmed the QIC's unfavorable decision for the same reasons the QIC rejected Plaintiff's arguments. Id. at 0027. The ALJ stated that the "evidence in the record indicates that [the Beneficiary] had the upper body strength to propel a manual wheelchair." Id. Like the QIC, the ALJ focused on Mr. Burget's evaluation of the Beneficiary's grip and shoulder strength. Id. The ALJ also noted the testimony of the witnesses at the hearing that the Beneficiary had "normal strength" to propel a wheelchair, but could not propel a manual chair due to her lack of endurance. AR 0027. The ALJ noted that Mr. Burget's evaluation stated her endurance was "fair." Id. The addendums, the ALJ found, were

---

AR, 0277, 0281. The Court Reporter Service preparing the transcript was located in Annapolis, Maryland. See, e.g., AR 0277. Therefore, the Court believes that Mr. Burget, rather than Mr. White, may have given this explanation at the hearing, and the transcriber made a mistake in the attribution.

submitted well after the initial evaluations and were "not consistent

with the manual muscle tests that were performed" in June of

2009.  Id.  Citing sections 1870 and 1879 of the Social Security Act,

the ALJ also found that Plaintiff was responsible for the

overpayment because Plaintiff "accepted payments it knew or could

have been expected to know was incorrect . . . ."  Id. at 0028.

Plaintiff appealed next to the Medical Appeals Council ("MAC"),

the final arbiter in the administrative appeals process.  The MAC

"adopt[ed]" the ALJ's decision after finding that Plaintiff had failed

to comply with the "explicit elements" required to show that a power

wheelchair is "medically reasonable and unnecessary."  Id. at 0008.

The MAC also made the following conclusion:

> Here, without qualification, the [occupational
> therapist's] evaluation's assessment of the
> beneficiary's "upper extremity strength" portrayed
> the beneficiary as capable of operating an optimally
> configured manual wheelchair without detriment to
> the beneficiary's ability to perform her mobility-
> related activities of daily living.

Id. at 0009.

The MAC determined that the addendums were

"inconsistent with the contemporaneous evidence" and did not

indicate that they referred to the Beneficiary's condition at the

time of the 2009 evaluation.  Id.  Finally, the MAC found that

Plaintiff was liable for the overpayment of $11, 681.38 under

sections 1870 and 1879 of the Social Security Act.  Id.

## II.   VENUE AND JURISDICTION

The Medicare Act, 42 U.S.C. §§ 1395 et seq., adopts the

judicial review process of section 405(g) of the Social Securities Act

and vests federal district courts with jurisdiction to review final

decisions of the Secretary for Health and Human Services over Part

B claims.  See Martin v. Shalala, 63 F.3d 497, 502 (7th Cir. 1995)

("Jurisdiction for that judicial review rests in 42 U.S.C. § 405(g)

rather than in 28 U.S.C. § 1331, the general federal question

jurisdiction statute.").  Plaintiff has exhausted the administrative

appeals process outlined in section 405(g) by obtaining a final

decision from the Secretary after Plaintiff presented its claims.  42

U.S.C. § 1395ff(b)(1)(A) (stating that an individual is entitled to

judicial review of Secretary's final decision after a hearing as

provided in § 405(g));  Americana Healthcare Corp. v. Schweiker,

688 F.2d 1072, 1082 (7th Cir. 1982) (discussing the two

prerequisites for a "final decision" under 42 U.S.C. § 405(g): a

presentation of a claim for benefits and exhaustion of remedies).

Additionally, Plaintiff's claims involve an amount-in-controversy of at least $1,400. See Medicare Program; Medicare Appeals; Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2013, 77 FR 59618-01 (stating that amount-in-controversy for judicial review under 42 U.S.C. § 1395ff(b)(1)(E)(i) for 2013, when Plaintiff filed the Complaint in this case, was $1,400). Therefore, this Court has jurisdiction to review the decision of the MAC, which was the final decision of the Secretary in this case. See 42 C.F.R. § 405.1130.

Venue is proper because Plaintiff is located in Springfield, Illinois. See 42 U.S.C. § 1395ff(b)(1)(C)(iii) ("Such action shall be brought in the district court of the United States for the judicial district in which the appellant is located . . . ."); see Complaint, d/e 1, ¶ 1 ("Plaintiff is an Illinois Corporation with its principal place of business in Springfield, Illinois, in the Central District of Illinois.").

### III.  LEGAL STANDARD

Although Plaintiff filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, Plaintiff is actually seeking a review of the MAC's decision denying Plaintiff's Medicare reimbursement claim for a powered wheelchair. See Rogers v.

Shalala, 97-7478, 1998 WL 325248, at *2 (N.D. Ill. June. 10, 1998) (treating parties' summary-judgment submissions as requests to review a decision by the MAC).  Therefore, Title XVIII of the Social Security Act, commonly known as the Medicare Act, 42 U.S.C. § 1395 et seq., and § 405(g) of the Social Security Act—not Rule 56—will govern the Court's decision on the Plaintiff's Motion and the Defendant's Motion to Affirm the MAC's Decision.  The resolution of these cross-motions thus closes the case.

### 1. The Medicare Act and Regulations and Guidelines Promulgated by the Secretary Establish the Legal Standards that Apply to Plaintiff's Claim.

Under the Medicare Act, the Secretary of Health and Human Services has the sole authority to determine whether to reimburse providers or beneficiaries for medical services and has promulgated regulations to guide and govern these decisions.  42 U.S.C. § 1395ff(a)(1) (stating that Secretary must promulgate regulations and make initial determinations about whether an individual is entitled to benefits under Part B of the Medicare Act); see also Heckler v. Ringer, 466 U.S. 602, 617 (1984) (acknowledging Secretary's discretion in determining whether a particular medical service is "reasonable and necessary").  Medicare Part B pays for

durable medical equipment like a powered wheelchair when the equipment is used in the Beneficiary's home and the treating physician has fulfilled the "conditions of payment" enumerated in the regulations:

> 1) conducting a face-to-face examination to determine the medical necessity of the powered wheelchair;
> 2) writing a prescription for the powered wheelchair; and
> 3) providing supporting documentation, including pertinent parts of the beneficiary's medical record (for example, history, physical examination, diagnostic tests, summary of findings, diagnoses, treatment plans and/or other information as may be appropriate) that supports the medical necessity for the powered wheelchair.

42 C.F.R. § 410.38(c)(2).

Additionally, items and services covered by Part B must be "reasonable and necessary" to treat an injury. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). To determine when a powered wheelchair and other "mobility assisted equipment" is reasonable and necessary, the Center for Medicare and Medicaid Services has issued the National Coverage Determination (NCD) for Mobility Assistive Equipment (280.3). Like other NCDs, NCD 280.3 was adopted by the Secretary and binds QICs, ALJs, and the MAC. See 42 C.F.R. § 405.1060(a)(4). NCD 280.3 states that a powered wheelchair is "reasonable and necessary" for those "who have a

personal mobility deficit sufficient to impair their participation in mobility-related activities of daily living (MRADLs) such as toileting, feeding, dressing, grooming, and bathing in customary locations within the home." NCD 280.3(b), available at http://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=219&ncdver=2&bc=AAAAgAAAAAAAA%3d%3d& (last visited May 15, 2014). In addition to this definition, NCD 280.3 includes nine questions meant to provide "clinical guidance" to determine when coverage of powered wheelchairs and other mobility assisted equipment is appropriate. Id.

Local Coverage Determinations ("LCDs") as well as program memoranda and manuals issued by Medicare contractors address local coverage issues. While these sources are not binding on ALJs or the MAC, the Secretary has instructed ALJs and the MAC to give "substantial deference" to these policies when they are applicable to making decisions on Medicare coverage. 42 C.F.R. § 405.1062.

## 2. The Court Can Affirm, Modify, or Reverse the MAC's Decision.

Section 405(g) of the Social Security Act authorizes the Court to affirm, modify, or reverse the MAC's decision on Medicare

coverage based on the record and the pleadings, with or without

remanding for a rehearing. Remanding a case is unnecessary when

"all factual issues have been resolved and the record can yield but

one supportable conclusion." Briscoe ex rel. Taylor v. Barnhart,

425 F.3d 345, 355 (7th Cir. 2005) (finding district court erred in

reversing without remanding case when ALJ failed to develop

record)(internal citations omitted).

When reviewing the MAC's decision about whether the

powered wheelchair was reasonable and necessary, this Court is

limited to assessing whether the MAC's decision is supported by

"substantial evidence," which means that a reasonable person

would find the evidence "adequate" to support the conclusion.

Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) (remanding

portion of appeal to Commissioner of Social Security when ALJ

failed to explain why he dismissed evidence of appellant's hand

impairment). The Court must not substitute its own judgment for

that of the MAC, reweigh the evidence, or reevaluate the facts. See,

e.g., Matchen v. Apfel, 215 F.3d 1330 (7th Cir. 2000) (finding that

ALJ's denial of disability benefits was not based on substantial

evidence when the ALJ's decision was based on a record that was

not "proper").  However, the Court will not simply rubber stamp the Secretary's decision and will conduct a "critical review of the evidence."  Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000) (reversing and remanding Social Security disability case to new ALJ after reviewing ALJ failed to properly consider "aggregate effect" of weight of "obviously obese applicant" with other ailments).

## IV.  ANALYSIS

The MAC's decision in this case is not supported by substantial evidence and must be reversed.  The question before the ALJ and MAC was whether Plaintiff submitted sufficient documentation to show that the powered wheelchair was medically necessary.  The MAC and ALJ found that Plaintiff failed to show that the motorized wheelchair was medically necessary—not because of a lack of documentation—but because the ALJ and MAC believed the documentation showed the Beneficiary *could* propel a manual wheelchair.  This "finding" is contrary to the opinions of the Beneficiary's occupational therapist and physician and reflects a selective reading of the medical records Plaintiff submitted— overemphasizing some evidence and ignoring other evidence.

### 1. The MAC Overemphasized "Strength" and Underemphasized Other Factors the NCD Requires Arbiters to Consider.

The MAC decision contains the sweeping conclusion that "without qualification, the [occupation therapist's] evaluation's assessment of the beneficiary's 'upper extremity strength' portrayed the beneficiary as capable of operating an optimally configured manual wheelchair without detriment to the beneficiary's ability to perform her mobility-related activities of daily living." AR 0009.

Mr. Burget's assessment of the Beneficiary's strength, however, is not the only consideration relevant to the MAC's conclusion. NCD 280.3(B)(7)(a) states that, in addition to strength, limitations of endurance, range of motion, and coordination are all "relevant" to determine whether a person has the "upper extremity function to propel a manual wheelchair." The physician's sole assessment about the beneficiary's "normal" upper-extremity strength, therefore, is not adequate to conclusively "portray[ ]" the beneficiary's capability to operate a manual wheelchair without detriment. Other factors are involved and "endurance" is one important factor that the MAC did not address. While an ALJ, and by extension the MAC, is not required to evaluate every piece of

evidence in a case, the ALJ must sufficiently articulate his

assessment of important evidence so the Court can "trace the path"

of the ALJ's reasoning.  Rohan v. Chater, 98 F.3d 966, 971 (7th Cir.

1996) (reversing and remanding social security disability case when

ALJ "simply indulged his own lay view" of claimant's ailment and

ignored reports of consulting physicians) (internal citations

omitted).  The only reference to the Beneficiary's "fair" endurance in

the MAC's decision is the MAC's rejection of Plaintiff's argument

that the ALJ misunderstood the use of the term "fair" to describe

the Beneficiary's endurance.  Therefore, the MAC did not consider

whether the Beneficiary had sufficient endurance to propel a chair.

The ALJ's decision on this issue is relevant because the MAC

adopted the ALJ's decision.  Unlike the MAC, who declined to

consider endurance, the ALJ addressed the effect of the

Beneficiary's "fair" endurance on her ability to use a manual

wheelchair.  He found, contrary to testimony at the hearing, that

her "fair" endurance actually enabled her to propel a manual

wheelchair.  See AR 0027.

At the hearing, the ALJ asked why the Beneficiary could not

propel a manual wheelchair when it "sounds like she has sufficient

strength in her upper body to do it." One of the witnesses explained that the Beneficiary "might be able to propel it for . . . a minimal amount of distance, but she could not sustain that to be able to do anything functional for herself . . . ." AR 0296. In direct contradiction to this testimony, the ALJ concluded in his decision that the Beneficiary's "fair" endurance indicated that she *could* propel a manual wheelchair: "At the hearing the Appellant's representative and witness both testified that although the Beneficiary has normal upper body strength to propel a manual wheelchair, she could not do it because she did not have the endurance. *However*, the OT evaluation indicates that the Beneficiary's endurance was 'fair.'" AR 0027 (emphasis added).

The ALJ failed to explain why he rejected this testimony that the Beneficiary's "fair" endurance meant she could not sufficiently propel a manual wheelchair and instead concluded that the Beneficiary's "fair" endurance meant that she could. At the hearing, the ALJ accused Mr. Burget of "just trying to correct the paperwork so you can get paid." This accusation is belied by the form on which Mr. Burget attested to the absence of a "financial relationship" between himself and Plaintiff. Further, the ALJ

declined to make any credibility finding about the testimony of the witnesses. Rather, the ALJ simply concluded on his own that "fair" endurance was all the 180-pound, 68-year-old Beneficiary needed to propel herself in a manual chair. Without sufficient evidence supporting this view, the ALJ appears to have rested solely on his own judgments and assumptions. Chater, 98 F.3d at 970 ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). This "flies in the face of [Seventh Circuit] instruction that determinations must be based on testimony and medical evidence in the record." Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 702 (7th Cir. 2009).

Evidence to support the Beneficiary's "fair" endurance was not the only factor missing from the MAC's decision. And while ALJs, and by extension those on the MAC, do not always have to consider all of the evidence of a beneficiary's impairments to withstand judicial review, they must at least have relied on the opinions of a medical professional who did. See Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006) (ALJ's failure to consider claimant's obesity was harmless error when ALJ predicated decision on opinions of physicians who had considered obesity). Although both

arbiters reference "medical history" in the boilerplate section of their decisions, neither decision recognizes that the Beneficiary has "limited trunk control" and "poor" unsupported balance.  She has also endured other significant ailments, including bladder cancer, which Mr. White mentioned at the ALJ hearing, that the ALJ and MAC either ignored or declined to reference.  See AR 0093.  The ALJ and MAC also omitted any mention of several of the Beneficiary's other ailments, such as obesity, arthritis, diabetes, fatigue, sleep apnea, body sores, irritable bowel syndrome, and osteoporosis, . See id.  The omission of these ailments from the ALJ decision is especially conspicuous because many of them—such as fatigue, obesity, and arthritis—may directly affect the Beneficiary's endurance and possibly her ability to use a manual wheelchair 12-16 hours a day. See Burget Eval, AR 0087 ("Patient spends 12-16 hour daily in her wheelchair.")

If the ALJ and MAC would have relied on the physician and occupation therapist's assessment of the Beneficiary's ability to propel a wheelchair, perhaps under Prochaska the ALJ and MAC would not have needed to itemize or discuss these illnesses and issues.  The problem, however, is that the ALJ and the MAC neither

discussed any of these issues nor referenced the records and addendums provided by Mr. Burget and Dr. Gelber. Instead, the ALJ and MAC rejected the addendums as late and inconsistent. They both decided that "fair endurance" was sufficient—despite the claims in the record to the contrary—for the 68-year-old cancer survivor who weighs 180 pounds, suffers from fatigue, diabetes, arthritis, and osteoporosis, and who is dependent on caregivers for 20 hours a week to assist her with chores and transfer her to and from her bed, to push herself around in a manual wheelchair. The MAC and ALJ appear to have relied only on the evidence that supported their decisions—namely the physician's note about the Beneficiary's "normal" upper extremity strength—without any consideration of the additional matters in the medical record and testimony. This Court cannot affirm the MAC's decision. See Bates v. Colvin, 736 F.3d 1093, 1099 (7th Cir. 2013) (reversing ALJ's decision that relied only on "cherry-picked statements" from the record that supported the ALJ's decision and ignored context of those statements and evidence suggesting claimant had a mental disability).

## 2. The MAC and ALJ Did Not Have Proper Grounds for Rejecting Addendums.

The MAC and ALJ rejected the Addendums submitted by Mr. Burget and Dr. Gelber as untimely and inconsistent with the record.  Defendant repeatedly argues that Mr. Burget's findings about the Beneficiary's upper extremity strength, active range of motion, grip strength, and endurance "contradict" the explanations in the addendums for why the Beneficiary cannot propel a wheelchair.  But these conclusions are also unsupported by substantial evidence because, once again, the ALJ and MAC do not cite any medical evidence to show why this panoply of test results shows that the Beneficiary could propel a wheelchair.  Without contradictory evidence, an administrative law judge, who is not a physician, has "no basis" to reject a treating physician's opinion, be it in a report, at a hearing, or in an addendum.  Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (internal citations omitted); see also Matchen, 215 F.3d at 1330 ("We have stressed before the risks of relying on lay assumptions about matters properly within an expert's purview.").

Without trained expertise and medical analysis—perhaps even observation of the Beneficiary—the test results on which the ALJ and MAC rely are simply a list of numbers and descriptions: elbow distally is 4-/5, "normal" upper extremity strength, grip strength 55 pounds, active range of motion is "within functional limits." These results do not indicate that the Beneficiary *can* propel a chair; and they certainly do not contradict her treating physician's and occupational therapist's claims that she cannot.

Defendant additionally argues that the addendums contradict the medical record by "redefining" the terms "normal" and "fair" that Dr. Gelber and Mr. Burget used in their respective evaluations. These terms, Defendant argues, are "objective" and indicate that the Beneficiary could use a manual wheelchair, while Plaintiff contends the term "normal" is subjective.

The Court sees no difference between the "justification addendums," including the additional letter Plaintiff submitted from Dr. Gelber discussing his use of the term "normal," and witness testimony at a hearing before an ALJ or evidence presented after a claim is denied. Plaintiff is permitted to submit additional evidence before the QIC and present witness testimony before an ALJ. See

42 C.F.R. § 405.1000 (stating that parties at a hearing before an ALJ may submit and examine evidence, and present and question witnesses); see also 42 C.F.R. § 405.966 (explaining procedure for submitting additional evidence before the QIC for a redetermination); AR 0174 (letter from NGS rejecting Plaintiff's appeal and stating that Plaintiff could present additional evidence with a request for reconsideration). Such testimony or evidence is not to be dismissed as "late" as the addendums were here. Like testimony in a hearing, the addendums sought to explain how, in light of Dr. Gelber's finding of "normal" strength, the Beneficiary was unable to use a manual wheelchair. The addendums sought to answer the question the QIC, ALJ, and MAC kept insisting was unanswered: why the Beneficiary could not use an optimally configured manual wheelchair. See NCD 280.3 (b)(7). Dr. Gelber and Mr. Burget stated in these addendums that the Beneficiary could not propel a manual wheelchair because she lacked the "additional energy . . . lasting strength/enduring in her upper body." AR 0134. The addendums also explain that due to the Beneficiary's balance and limited trunk control, a manual wheelchair would be unsafe for her to use. Id. at 0091, 0134. In

short, the Beneficiary could not propel a wheelchair because of other relevant factors, none of which the ALJ or MAC considered. Many of these explanations were already in Mr. Burget's evaluation, signed by Dr. Gelrber, about the necessity of the power wheelchair accessories.  See, e.g., Burget Eval, AR 0089 ("This back system has built in lateral support to assist Mary Kay with trunk control so that she is able to sit in a functional upright position . . . . Mary Kay lacks the upper extremity strength and trunk control to lean forward and raise or lower her center mount foot platform manually.").  Therefore, the ALJ and MAC should not have dismissed the addendums as late and contradictory when the addendums sought to explain why the Beneficiary, even with some strength, could not propel herself in a manual wheelchair.

### III. CONCLUSION

**The Court REVERSES the MAC's decision because it was not based on substantial evidence and contains conclusions that are similarly unsupported by the record.  The MAC's and ALJ's decisions overemphasized the Beneficiary's strength and underemphasized other important factors that the treating physician, occupation therapist, and applicable National**

Coverage Determination found relevant to the determination of whether the Beneficiary could propel a manual wheelchair. Additionally, the MAC and ALJ's improper dismissals of the addendums as "contradictory" were not supported by the record.

The Court finds that this case is one of the rare instances when the facts in the record support only one conclusion: that the documentation submitted by Plaintiff, including the medical records, the addendums, and the testimony at the ALJ hearing proves that Beneficiary's motorized wheelchair was reasonable and necessary. Accordingly, the Court REVERSES the MAC's decision to find Plaintiff liable for the alleged overpayment.

CASE CLOSED.

ENTERED: July 1, 2014

/s/ Sue E. Myerscough
SUE E. MYERSCOUGH
United States District Judge